UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRITTANY RENEE GIBSON,<br><br>Petitioner,<br><br>v.<br><br>STATE OF CALIFORNIA,<br><br>Respondent. | No.  2:22-cv-00844-KJM-CSK<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This case proceeds on the amended petition filed March 21, 2024.  Petitioner challenges her 2018 conviction for attempted murder, conspiracy to commit murder, and assault with a firearm.  (Cal. Pen. Code. §§ 664/187(a), 182, 245(a)(2).) Petitioner is serving a sentence of 25 years to life. After careful review of the record and the applicable law, the Court concludes that the petition should be denied.

I.      PROCEDURAL BACKGROUND

   A. State Court History

On June 28, 2018, in the Sacramento County Superior Court, petitioner was convicted of attempted murder, conspiracy to commit murder, and assault with a firearm. (ECF No. 30-2 at 137-139.)  On April 26, 2019, she was sentenced to an indeterminate state prison term of 25 years

1    to life for conspiracy to commit murder; the court stayed the sentence on the remaining counts.

2    (ECF No. 30-24 at 1).[1]

3        Petitioner appealed her conviction. (ECF No. 30-14.) She raised the following issues in

4    her brief on appeal: (1) the trial court abused its discretion and denied petitioner her rights to due

5    process when it failed to instruct the jury on the defense theory of accessory after the fact;

6    alternately, defense counsel committed ineffective assistance when he failed to request such an

7    instruction; (2) the trial court committed prejudicial error when it failed to instruct the jury with

8    the lesser-included offense of conspiracy to commit assault with a deadly weapon; (3) the trial

9    court erred when it imposed a sentence of seven years to life for attempted premeditated murder;

10    and (4) the fines, fees and assessments imposed by the trial court must be stayed because the trial

11    court failed to find that petitioner had the ability to pay them. (Id.) On February 22, 2021, the

12    California Court of Appeal affirmed the judgment in a reasoned opinion. (ECF No. 30-19.)

13        Petitioner filed a petition for review in the California Supreme Court, raising the same

14    claims as in her opening brief. (ECF No. 30-20.) The Court denied the petition on May 12, 2021.

15    (ECF No. 30-22.)

16        On September 28, 2022, petitioner filed a petition for habeas corpus in the Sacramento

17    Superior Court raising the following issues: (1) ineffective assistance of counsel, consisting of

18    subclaims (1A) failure to investigate; (1B) failure to seek appointment of investigator;

19    (1C) failure to present a defense; (1D) failure to request jury instruction on conspiracy to commit

20    assault with a deadly weapon; (1E) failure to request jury instruction on accessory after the fact;

21    (1F) failure to promptly declare a mistrial; (1G) failure to call defense witnesses; (1H) failure to

22    suppress prejudicial evidence; and (1I) failure to suppress protected information; (2) trial court

23    erred by failing to instruct on the lesser offense of conspiracy to commit assault with a deadly

24    weapon; (3) trial court erred by failing to instruct on lesser offense of accessory after the fact;

25    (4) trial court erred by denying a motion for new trial; (5) prosecutorial misconduct; and (6) the

26    Court of Appeal's ruling on ineffective assistance claims was unreasonable. (ECF No. 30-24 at

27    _____

28    [1] Record citations refer to page numbers assigned by the Court's docketing system.

12-49.)  On February 22, 2023, the Sacramento Superior Court denied petitioner's habeas petition in a reasoned opinion.  (ECF No. 30-24 at 1-10.)  The Court of Appeal denied the habeas petition on August 11, 2023 (ECF No. 30-25), and the California Supreme Court denied it on February 14, 2024.  (ECF No. 30-26.)

B.  The Federal Petition

The federal petition was filed on June 30, 2022.  (ECF No. 9.)  On July 24, 2023, this action was stayed while petitioner exhausted her unexhausted claims in state court. (ECF No. 15.) The operative amended petition was filed on March 21, 2024.  (ECF No. 25.)  On June 11, 2024, respondent filed an answer.  (ECF No. 31.)  Petitioner did not file a reply.

Petitioner raises six claims in the amended petition:  (1) ineffective assistance of counsel, consisting of subclaims (1A) failure to investigate; (1B) failure to seek appointment of investigator; (1C) failure to present a defense; (1D) failure to request jury instruction on conspiracy to commit assault with a deadly weapon; (1E) failure to request jury instruction on accessory after the fact; (1F) failure to promptly declare a mistrial; (1G) failure to call defense witnesses; (1H) failure to suppress prejudicial evidence; and (1I) failure to suppress protected information; (2) trial court erred by failing to instruct on the lesser offense of conspiracy to commit assault with a deadly weapon; (3) trial court erred by failing to instruct on the lesser offense of accessory after the fact; (4) trial court erred by denying motion for a new trial; (5) prosecutorial misconduct; and (6) the Court of Appeal's ruling on ineffective assistance claims was unreasonable.  (ECF No. 25.)

II.    FACTS

After independently reviewing the record, the Court finds the state appellate court's factual summary to be accurate and adopts it herein:

A. The Shooting

The victim, Terrell, moved from Alabama to Sacramento in September 2016. He met Gibson and began a dating relationship with her a short time later. Terrell understood that MacDonald was Gibson's ex-boyfriend. MacDonald received mail at Gibson's house and called from time to time. But Terrell never laid eyes on MacDonald and never even saw a photograph of him.

That changed one day in late October or early November 2016, as Gibson and Terrell were preparing to leave Gibson's house. The couple was backing out of the driveway in Gibson's car when MacDonald appeared, blocked the driveway and approached the car, demanding to know, " 'What you got going on? Just what you doing? Who is this?' " Gibson drove away, but MacDonald followed in his car.

Gibson spoke to MacDonald by phone as she drove. She warned MacDonald to stop following her or she would shoot. She then produced a .40 caliber Smith & Wesson handgun from her purse. She cocked the gun as she drove. MacDonald gave up the chase and Gibson and Terrell continued on their way. During the trial, Terrell testified that Gibson owned two guns and always carried the loaded .40 caliber Smith & Wesson in her purse.

Terrell went to Alabama for several weeks in December 2016. He returned to Sacramento in January 2017. He took up residence with Gibson, but things were not the same. Gibson was still receiving MacDonald's mail and speaking with him regularly by phone, just as she had done before Terrell went to Alabama. Only now, Terrell began to suspect that Gibson might be cheating on him.

Terrell was hoping to enjoy a romantic evening with Gibson on February 6, 2017. But Gibson came home later than expected and then announced that she was going out with a friend. Disappointed, Terrell went for a short walk. When he returned, Gibson's friend was there. An argument ensued. During the course of the argument, Terrell climbed into the passenger's seat of Gibson's parked car, as if to accompany her. Gibson tried to pull Terrell out of the car. Terrell resisted. Gibson scratched Terrell's face in the tussle.

Gibson told Terrell he needed to leave the house. Terrell agreed and began collecting his belongings. As Terrell was packing to leave, Gibson asked that he return her car keys. Terrell responded that he did not have them. However, Terrell forgot that he had taken the keys and put them in the pocket of some work clothes. It was only later, after the events described below, that Terrell discovered the keys in his pocket.

Terrell left Gibson's house and went to the home of a nearby relative. Over the course of the evening, Gibson called Terrell several times and sent several text messages, all demanding the return of her keys. Gibson also called 911 and reported that Terrell had taken her keys. Sacramento Police Officer Jeffrey Daigle called Terrell to ask about the keys. Terrell insisted, again, that he did not have them.

Gibson appeared at the home of Terrell's relative sometime later. Gibson honked her horn, banged on the security gate, and threw a garbage can, all the while yelling about the keys. Gibson later contacted Terrell's relative by text, stating that she knew the route Terrell took to work, and was going to "'get him and mess him up.'"

Terrell went to work that night, completed his shift, and returned to his relative's house. During this time, he exchanged numerous text

4

messages with Gibson regarding the missing car keys and other personal belongings. It was clear to Terrell by now that the relationship with Gibson was over, and his belongings were probably gone for good.

Terrell went to the store for cigarettes on the evening of February 7, 2017. He then walked back to his relative's house. He chose a route that would take him past Gibson's house, thinking he might knock on her door and ask for his things. As he walked along a frontage street near Gibson's house, he saw a car approaching. He recognized the car as Gibson's. The car pulled up next to Terrell, and Terrell approached the driver's side. The driver's side window rolled down, and Terrell saw a man's face. Terrell did not immediately recognize the face and turned to walk away. As he did so, however, he saw Gibson lean forward from the passenger's seat, so that her head was visible on the far side of the male driver. Terrell saw the man turn towards Gibson. He then saw Gibson nodding her head. The man reached for something with his right hand. The man then turned to face Terrell. Terrell, upon seeing the man's face again, now recognized him as MacDonald. Terrell then saw Gibson's .40 caliber Smith & Wesson in the man's hand.

MacDonald pointed the gun at Terrell and started firing. Terrell was shot in the stomach, thigh, and forearm from a distance of approximately 15 feet. The car sped away. Terrell managed to get up and began limping down the street. Within seconds, however, Terrell saw the car reverse and return to his location. Terrell was then shot four more times; once in the buttocks, twice in the thigh, and once in the hand. Terrell was not able to see who shot him the second time, as his back was turned and he was trying to get away. The car then drove away a second time, leaving Terrell bleeding in the street.

Terrell managed to stand again and started staggering towards his relative's house. He soon collapsed, however. Neighbors called 911 and came to Terrell's aid. Terrell told them, "Brittany Gibson and her boyfriend just shot me." Terrell called his relative and told her the same thing.

Officer Daigle arrived on the scene and found Terrell lying face down on the ground. Terrell was lucid and told Daigle that Gibson and her ex-boyfriend pulled up alongside him, and the ex-boyfriend starting shooting. Daigle ran Gibson's name and learned that she was the registered owner of two guns, including the .40 caliber Smith & Wesson. Daigle also learned that MacDonald was on probation and used Gibson's address as his residence.

After the shooting, MacDonald and Gibson parked the car and made their way to the apartment of MacDonald's sister. They returned to their parked car several hours later. Police, who had been surveilling the car, followed MacDonald and Gibson to a gas station, where they were placed under arrest. A video camera captured them kissing in the backseat of the patrol car.

Terrell was transported to the hospital, where he was treated for multiple gunshot wounds. Police visited Terrell in the hospital early

the next morning. Terrell readily identified MacDonald from a six-pack photo lineup. Terrell remained in the hospital for some weeks, undergoing a blood transfusion and surgery to repair damage to his intestines.

B. The Charges and Jury Trial

MacDonald and Gibson were charged by amended information with attempted murder (§§ 664, 187, subd. (a)—count one), conspiracy to commit murder (§ 182, subd. (a)(1)—count two), and assault with a firearm (§ 245, subd. (a)(2)—count three). MacDonald was also charged with possession of a firearm by a felon (§ 29800, subd. (a)(1)—count four). The information further alleged that the attempted murder was committed willfully, deliberately, and with premeditation (§ 664, subd. (a)), and that Gibson, a principal in the offense, was armed with a firearm (§ 12022, subd. (a)(1)) and MacDonald personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally discharged a firearm causing great bodily injury or death. (§ 12022.53, subds. (b)-(d).) The information further alleged that MacDonald had a prior serious felony conviction. (§§ 667, subds. (b)-(i), 1170.12.) MacDonald and Gibson pled not guilty and denied the allegations.

The matter was tried to a jury in June 2018. The prosecution's witnesses testified substantially as described ante. Gibson testified in her own defense. Gibson explained that she owned two guns, which she kept for self-defense. She recalled that she began dating MacDonald in 2015. According to Gibson, MacDonald was abusive and occasionally violent. Gibson testified that she was afraid of him.

Gibson recalled that MacDonald was in custody when she met Terrell in September 2016. Gibson acknowledged that she remained in regular contact with MacDonald, even after she started dating Terrell. Gibson testified that MacDonald was released from custody in October 2016, and he regularly stopped by her house to collect his mail. She explained that MacDonald and Terrell encountered one another in front of her house on several occasions, most of them contentious. She remembered one incident in which MacDonald blocked her driveway, and another in which MacDonald followed Gibson and Terrell as she spoke with him by phone. However, she denied threatening to shoot MacDonald, or driving with a cocked gun.

Gibson acknowledged arguing with Terrell on February 6, 2016. She confirmed that Terrell agreed to leave and eventually decamped to his relative's house. She also confirmed that there was an extended back and forth regarding the whereabouts of her car keys. She explained that she retrieved a spare set of keys from her grandparents and then drove to the home of Terrell's relative, where she merely honked her horn. She denied getting out of the car or throwing a garbage can.

Gibson, a nursing student, explained that she had clinical rotations in Grass Valley on February 7, 2016. She was planning to spend the night in Grass Valley and asked MacDonald to accompany her.

MacDonald agreed and went to Gibson's house. Gibson was out, but told MacDonald to let himself into the house with a key that she kept outside. Gibson returned to the house shortly thereafter. MacDonald and Gibson were sexually intimate and then left for Grass Valley at 3:00 a.m. Gibson attended her clinical rotations in Grass Valley. When she was done, she and MacDonald decided to return to Sacramento rather than spend the night in Grass Valley.

Gibson and MacDonald arrived in Sacramento on the afternoon of February 7, 2016. They ran some errands. Gibson testified that she did not have her gun and did not know that MacDonald had a gun. According to Gibson, MacDonald was driving back to her house, and she was reclining in the passenger seat with her eyes closed. She sensed the car slowing down and assumed they were pulling up to her house. In Gibson's version of events, she heard the driver's side window descend and sat up in time to see MacDonald firing at someone. She recognized Terrell as the target within the first few shots.

Gibson testified that she tried to grab MacDonald's arm, but he threw her off and continued firing. She said she then tried to open the passenger's side door to leave but was unable to do so because MacDonald was driving too quickly. She said she then attempted to call 911 but was unable to complete the call because MacDonald grabbed her phone.

After the shooting, MacDonald drove to an apartment complex and parked the car. According to Gibson, MacDonald threatened to harm her and instructed her to keep her mouth shut. Gibson explained that MacDonald still had her gun and phone, and she was afraid of what he might do. MacDonald and Gibson then went across the street to the apartment of one of MacDonald's girlfriends or ex-girlfriends. MacDonald took a shower. He then used Gibson's phone to arrange for a ride to his sister's apartment. Gibson did not try to leave the apartment or summon help while MacDonald was showering.

Gibson and MacDonald then went to MacDonald's sister's apartment. They spent several hours there, during which time, Gibson briefly fell asleep. MacDonald woke Gibson at approximately 10:00 p.m. so she could watch a television news report about the shooting. As before, Gibson did not try to leave MacDonald or call police. MacDonald's sister then drove Gibson and MacDonald to Gibson's house. Gibson went into the house by herself to retrieve some things for nursing school. Once again, she made no attempt to call police or summon help.

Gibson, MacDonald, and MacDonald's sister then made their way to the parking lot where Gibson's car was parked. Gibson and MacDonald were arrested a short time later. According to Gibson, MacDonald instructed her to say nothing to police as they sat in the backseat of the patrol car.

Gibson was questioned by police a short time later. She initially told police she had no idea why she had even been pulled over. She then told police she kept her guns in a cabinet in the garage. When a

probation search of her house failed to uncover the guns, Gibson told police they had been stolen. She did not tell police that MacDonald had taken her guns or used her .40 caliber Smith & Wesson to shoot Terrell. On cross-examination, Gibson admitted lying to police.

Gibson continued to communicate with MacDonald after she was released from jail, while he remained in custody. Among other things, Gibson sent MacDonald emails professing her love, raising the possibility of marriage, and opining that she might not qualify for a nursing license with a felony conviction.

Gibson testified that MacDonald repeatedly threatened her—after the shooting, at the time of their arrest, and thereafter—warning her to "stay loyal" and intimating that he might hurt her if she failed to do so. Gibson also claimed that MacDonald suggested they get married so she would be unable to testify against him.

Psychologist Geoffrey Loftus, Ph.D., testified as an expert on eyewitness identification, memory, and perception. Dr. Loftus explained that several factors may affect the accuracy of a witness's memory. The duration of the event, stressfulness of the event, and quality of lighting can affect a person's ability to receive information and undermine the accuracy of an eyewitness identification. The presence of a weapon can also undermine the accuracy of an eyewitness identification, as people tend to focus on the weapon, rather than the person holding it.

Dr. Loftus emphasized that witnesses may unconsciously rely on "pre[-]event information" and "post[-]event information" to supplement their memories of actual events and may honestly and confidently believe that they remember things that are not based on their actual experiences. As a result, Dr. Loftus explained, "a witness can provide a very confident account of anything, including the identity of somebody who they saw commit a crime and yet potentially be wrong." Based on a hypothetical with facts similar to the present case, Dr. Loftus opined that the eyewitness identification of a person shot multiple times from a car at a distance of 15 feet, in the dark, would not be "super reliable," even though the person might have a high degree of confidence in the identification.

C. Verdict and Sentencing

The jury found MacDonald and Gibson guilty as charged. The trial court sentenced Gibson to an indeterminate term of 25 years to life for the conspiracy to commit murder charged in count two (§ 182, subd. (a)(1)), stayed the sentence on the remaining counts, and imposed various fines and fees.

People v. Gibson, Case No. C089393 (Feb. 22, 2021) (ECF No. 30-19).

III.    STANDARDS FOR A WRIT OF HABEAS CORPUS UNDER ANTITERRORISM

AND EFFECTIVE DEATH PENALTY ACT ("AEDPA")

An application for a writ of habeas corpus by a person in custody under a judgment of a

1  state court can be granted only for violations of the Constitution or laws or treaties of the United

2  States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation

3  or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire,

4  502 U.S. 62, 67-68 (1991).

5          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

6  corpus relief:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an
>     unreasonable application of, clearly established Federal
>     law, as determined by the Supreme Court of the United
>     States; or
>
> (2) resulted in a decision that was based on an unreasonable
>     determination of the facts in light of the evidence
>     presented in the State court proceeding.

14  28 U.S.C. § 2254(d).

15          For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

16  holdings of the Supreme Court at the time of the last reasoned state court decision.  Thompson v.

17  Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39-40

18  (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

19  362, 412 (2000)).  Circuit court precedent "may be persuasive in determining what law is clearly

20  established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859

21  (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may

22  not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a

23  specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S.

24  58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)).  Nor may it be

25  used to "determine whether a particular rule of law is so widely accepted among the Federal

26  Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id.  Further,

27  where courts of appeals have diverged in their treatment of an issue, there is no "clearly

28  established federal law" governing that issue.  See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2] Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous") (internal quotations and citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Id. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

---

[2] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1  § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

2  considering de novo the constitutional issues raised.").

3      The court looks to the last reasoned state court decision as the basis for the state court

4  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

5  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

6  previous state court decision, this court may consider both decisions to ascertain the reasoning of

7  the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a

8  federal claim has been presented to a state court and the state court has denied relief, it may be

9  presumed that the state court adjudicated the claim on the merits in the absence of any indication

10  or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption

11  may be overcome by a showing "there is reason to think some other explanation for the state

12  court's decision is more likely."  Id. at 99-100.  Similarly, when a state court decision on

13  petitioner's claims rejects some claims but does not expressly address a federal claim, a federal

14  habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the

15  merits.  Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98).  If a

16  state court fails to adjudicate a component of the petitioner's federal claim, the component is

17  reviewed de novo in federal court.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

18      Where the state court reaches a decision on the merits but provides no reasoning to

19  support its conclusion, a federal habeas court independently reviews the record to determine

20  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

21  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

22  review of the constitutional issue, but rather, the only method by which we can determine whether

23  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

24  reasoned decision is available, the habeas petitioner has the burden of "showing there was no

25  reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

26      A summary denial is presumed to be a denial on the merits of the petitioner's claims.

27  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze

28  just what the state court did when it issued a summary denial, the federal court reviews the state

11

1  court record to "determine what arguments or theories . . . could have supported the state court's

2  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

3  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

4  Court." Richter, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there

5  was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939

6  (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

7        When it is clear, however, that a state court has not reached the merits of a petitioner's

8  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

9  habeas court must review the claim de novo.  Stanley, 633 F.3d at 860 (citing Reynoso v.

10  Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006)).

11  IV.  DISCUSSION

12        A.  Claim One: Ineffective Assistance of Counsel

13        Petitioner asserts that her trial counsel rendered ineffective assistance in multiple ways, as

14  set forth in nine subclaims. The Court of Appeal addressed some of these subclaims on direct

15  review, and the Superior Court addressed other subclaims on habeas review.

16        To state an ineffective assistance of counsel claim, a defendant must show that (1) her

17  counsel's performance was deficient, falling below an objective standard of reasonableness, and

18  (2) her counsel's deficient performance prejudiced the defense.  Strickland v. Washington, 466

19  U.S. 668, 687-88 (1984).  For the deficiency prong, "a court must indulge a strong presumption

20  that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

21  the defendant must overcome the presumption that, under the circumstances, the challenged

22  action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted).  For the prejudice

23  prong, the defendant "must show that there is a reasonable probability that, but for counsel's

24  unprofessional errors, the result of the proceeding would have been different.  A reasonable

25  probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.  "The

26  standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two

27  apply in tandem, review is 'doubly' so." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal

28  citations omitted).  "When § 2254(d) applies, . . . the question is whether there is any reasonable

12

1    argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u>

2                    1.   <u>Failure to investigate and present evidence</u>

3          Petitioner's ineffective assistance subclaims 1A, 1B, 1C, and 1G allege that her trial

4    counsel failed to investigate and present evidence at trial.  The Sacramento Superior Court issued

5    the last reasoned state court decision addressing these subclaims on habeas review.  The Superior

6    Court denied the subclaims for the following reasons:

> Petitioner contends the trial counsel rendered ineffective assistance
> in several ways: 1A – failure to investigate; 1B – failure to seek
> appointment of investigator; 1C – failure to present a defense; 1D –
> failure to request conspiracy to commit assault with a deadly weapon
> jury instruction; 1E – failure to request accessory after the fact
> instruction; 1F – failure to promptly declare a mistrial; 1G – failure
> to call defense witnesses; 1H – failure to suppress prejudicial
> evidence under Evidence Code section 325; and 1I – failure to
> suppress protected information.
>
> To show constitutionally inadequate assistance of counsel, a
> defendant must show that counsel's representation fell below an
> objective standard and that counsel's failure was prejudicial to the
> defendant. [Citations.] Actual prejudice must be shown, meaning that
> there is a reasonable probability that, but for the attorney's error(s),
> the result would have been different.  <u>Strickland v. Washington</u>
> (1984) 466 U.S. 668, 694. . . .
>
> Four of the subclaims involve Petitioner's assertions trial counsel
> failed [to] investigate and present evidence at trial: 1A – failure to
> investigate; 1B – failure to seek appointment of investigator; 1C –
> failure to present a defense; and 1G – failure to call defense
> witnesses.  Petitioner fails to establish trial counsel's conduct fell
> below an objective standard of reasonableness.   For example,
> Petitioner asserts trial counsel failed to "investigate witnesses the
> victim came into contact with that night at the crime scene who were
> called to testify"; but Petitioner fails to explain what trial counsel
> would have learned had he investigated. She further asserts trial
> counsel should have called witnesses Sasha Hennigan and Maurice
> Sims; however, Petitioner has not included a declaration, affidavit,
> or other statement from the witnesses indicating what they would
> have said had they testified at trial.   .  .  . Petitioner has not
> supplemented the record with witness statements or other evidence
> for the Court to consider. Petitioner simply contends counsel should
> have done more. Vague claims that counsel should have done more
> are insufficient to warrant habeas relief.

26   (ECF No. 30-24 at 3-4.)

27          In the amended petition, petitioner alleges that her trial counsel failed to investigate "all

28   available evidence," including ballistics information, cell phone data, and "any other information

13

1    "leading to acquittal." (ECF No. 25 at 3.) Petitioner asserts that trial counsel "failed to secure the

2    home security video footage of the house facing the incident" and to investigate witnesses . . .

3    [who] could have provided potential favorable evidence." (Id. at 4.) Defense counsel allegedly

4    "relied on [the] State's investigation" and failed to obtain witness statements or seek the

5    appointment of an investigator. (Id. at 5.) Defense counsel failed to call any witnesses for the

6    defense and came to trial with "minimal to no preparation." (Id. at 6.) He "made no attempt to

7    communicate with any witnesses that would have given exculpatory evidence." (Id. at 10.)

8    Based on these and similar allegations, petitioner asserts ineffective assistance subclaims 1A, 1B,

9    1C, and 1G.

10          As summed up in his closing statement, petitioner's trial counsel presented the following

11   theory of the case: It was not in dispute that the victim was shot multiple times from the driver's

12   side window of petitioner's car, with a gun owned by petitioner. Nor could it be reasonably

13   disputed that MacDonald was the shooter. (ECF No. 30-13 at 106.) It also was not disputed that

14   petitioner was in the car during the shooting and saw everything that happened. (Id. at 108.)

15
16          What is in dispute? What's in great dispute is before the shooting and
             during the shooting, what did [petitioner] know? What was her role?
             . . . Did Brittany Gibson know that Devonta Macdonald was going to
17          shoot Terrell Plains? The answer is no.

18   (Id.) Defense counsel argued that petitioner had no motive to want Terrell Plaines shot or killed,

19   because they "had a good relationship" until their argument the previous night about the car keys.

20   (Id. 109-110.) Defense counsel contested Terrell's[3] testimony that "he believed petitioner nodded

21   her head to tell Mr. MacDonald to shoot him[,]" citing communications between Terrell and

22   petitioner after the shooting that were arguably inconsistent with Terrell believing she had wanted

23   him killed. (Id. at 111-113.) Defense counsel also cited Terrell's statements to police after the

24   shooting, noting that he did not mention petitioner nodding her head until he met with the district

25   attorney's investigator two months later in April 2017. (Id. at 115-116.) Defense counsel

26   contended that petitioner had been napping in the passenger seat of the car and, as she sat up,

27
     _____
28   [3] For consistency with the state court's factual summary, the Court will refer to Terrell Plaines as
     "Terrell."

1  realized shots were being fired (id. at 116); she lacked the specific intent required for attempted

2  murder and was only guilty of being an accessory after the fact.  (Id. at 122-123.)

3      In short, petitioner's trial counsel attempted to cast doubt on the prosecution's case rather

4  than marshal defense evidence that exonerated petitioner. However, petitioner has not shown that

5  any such evidence existed.  As the Superior Court noted, she "has not supplemented the record

6  with witness statements or other evidence for the Court to consider.  Petitioner simply contends

7  counsel should have done more."  (ECF No. 30-24 at 4.)

8      Defense counsel has a "duty to make reasonable investigations or to make a reasonable

9  decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691; see also

10  Cox v. Ayers, 613 F.3d 883, 893 (9th Cir. 2010) ("Counsel's investigation must, at a minimum,

11  permit informed decisions about how best to represent the client.").  This includes a duty to

12  investigate the prosecution's case and to follow up on any exculpatory evidence.  Kimmelman v.

13  Morrison, 477 U.S. 365, 384-385 (1986); Duncan v. Ornoski, 528 F.3d 1222, 1234-1235 (9th Cir.

14  2008).  A claim of ineffective assistance of counsel based upon an alleged failure to investigate

15  requires the petitioner to show what information would have been revealed by the investigation

16  and how that information would have produced a different result.  See Gallego v. McDaniel, 124

17  F.3d 1065, 1077 (9th Cir. 1997).

18      Here, petitioner points to no specific evidence her attorney failed to present that would

19  have bolstered the defense theory that she had no prior knowledge that MacDonald intended to

20  shoot Terrell.  Nor does she cite any new evidence that casts doubt on Terrell's testimony that she

21  nodded to MacDonald just before the shooting.  (See ECF No. 30-8 at 240-243 (nodding

22  testimony)).  Many key facts were undisputed, and it is unclear what ballistics information, for

23  example, would have added to the defense.  Nor has petitioner identified any witness testimony in

24  her favor that was not presented at trial.  Because petitioner merely speculates that, if defense

25  counsel had investigated more, it might have changed the outcome, her subclaims alleging failure

26  to investigate or call witnesses fail both prongs of the Strickland test.  See Gonzalez v. Knowles,

27  515 F.3d 1006, 1014-16 (9th Cir. 2008) (concluding that the petitioner's claims "grounded in

28  speculation" established neither deficient performance nor prejudice); see, e.g., White v. Pollard,

15

1  2020 WL 1173508, at *5 (C.D. Cal. Jan. 29, 2020) (where petitioner does identify "any favorable

2  information trial counsel would have discovered" with additional investigation and "fails to

3  explain how additional trial preparation would have altered the trial," his "cursory and vague

4  claim cannot support habeas relief").  The state court's decision on subclaims 1A, 1B, 1C, and 1G

5  was not contrary to, or an unreasonable application of, clearly established federal law, nor was it

6  based on an unreasonable application of the facts.  Habeas relief on these subclaims should be

7  denied.

8  2.  <u>Failure to request instructions on lesser included offenses</u>

9       Petitioner's next ineffective assistance subclaims involve trial counsel's failure to request

10  instructions on the lesser included offenses of conspiracy to commit assault with a deadly weapon

11  (1D) and accessory after the fact (1E).

12  a.  <u>No instruction on conspiracy to commit assault with deadly weapon</u>

13       As to subclaim (1D), petitioner was charged in Count 2 with conspiracy to commit

14  murder.  The jury was instructed on this offense as follows:

> To prove that a defendant is guilty of this crime, the People must prove that:
>
> 1. The defendant intended to agree and did agree with the other defendant to intentionally and unlawfully kill;
>
> 2. At the time of the agreement, the defendant and the other alleged member of the conspiracy intended that one or more of them would intentionally and unlawfully kill;
>
> 3. One of the defendants or both of them committed at least one of the following overt acts to accomplish murder:
>
>> Overt Act No. 1: That in pursuance of the conspiracy, [Gibson] provided a loaded gun to [MacDonald];
>>
>> Overt Act No. 2: That in pursuance of the conspiracy, [Gibson] provided [MacDonald] the use of her vehicle;
>>
>> Overt Act No. 3: That in pursuance of the conspiracy, [Gibson] nodded her head in affirmative identifying [Terrell] to [MacDonald];
>>
>> Overt Act No. 4: That in pursuance of the conspiracy, [MacDonald] shot [Terrell];
>
> AND

16

1          4.   At least one of these overt acts was committed in California.

2    (ECF No. 30-2 at 120-21.)  There was no instruction on conspiracy to commit assault with a

3    deadly weapon.  The jury found petitioner guilty of Count 2. (ECF No. 30-2 at 138.)

4          On habeas review, the Sacramento Superior Court noted that subclaims 1D and 1E were

5    rejected on direct appeal and thus barred in habeas.  (ECF No. 30-24 at 4-5.)  On direct review,

6    the Court of Appeal addressed 1D as follows:

7              Failure to instruct . . . on a lesser included offense 'is not subject to
               reversal unless an examination of the entire record establishes a
8              reasonable probability that the error affected the outcome.' . . .

9              By convicting MacDonald and Gibson in one count of attempted
               willful, deliberate, and premeditated murder of Terrell, the jury
10             necessarily found that each had the specific intent to kill required for
               conspiracy to commit murder, rather than some lesser intent. . . . The
11             jury's verdict establishes that MacDonald and Gibson acted with the
               intent to kill, rather than an intent to commit some lesser offense.
12
               We also conclude that any error was harmless given the strength of
13             the conspiracy charge against MacDonald and Gibson. The evidence
               showed that MacDonald fired three shots at Terrell at close range and
14             then drove away. The car then reversed and returned to Terrell, who
               was now limping down the street. He was then shot four more times.
15             No reasonable juror could have found from the foregoing evidence
               that MacDonald and Gibson conspired only to frighten or wound
16             Terrell, rather than kill him. To the extent jurors believed there was
               a conspiracy, they could not have rationally concluded that the object
17             of the conspiracy was anything other than murder. It follows that any
               error in failing to instruct the jury on conspiracy to commit assault
18             with a deadly weapon was harmless.

19   (ECF No. 30-19 at 17-18; see also ECF No. 30-24 (Superior Court ruling on habeas review that

20   "[b]ased on this holding, Petitioner is unable to establish prejudice. If no prejudice is established,

21   it is unnecessary to determine whether counsel's performance was deficient.")).  The Court

22   addresses this claim below.

23                          b.   No instruction on accessory after the fact

24         As to subclaim 1E, the prosecutor in closing argument told the jury that petitioner could

25   be found guilty of Count 1 (attempted murder) and Count 2 (conspiracy to commit murder) on an

26   aiding and abetting theory of liability.  (ECF No. 30-13 at 77-80.)  The jury was instructed on the

27   elements of aiding and abetting as follows:

28             To prove that defendant Brittany Gibson is guilty of a crime based

                                          17

on aiding and abetting that crime, the People must prove that:

The perpetrator committed the crime;

The defendant knew that the perpetrator intended to commit the crime;

Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND

The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

. . .

If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that the person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

(ECF No. 30-2 at 120-121). There was no instruction on the theory of accessory after the fact.

The jury found petitioner guilty of Counts 1 and 2. (ECF No. 30-2 at 137-138.)

On direct review, the Court of Appeal addressed 1E as follows:

During closing argument, Gibson's trial counsel argued at length that Gibson's involvement in the crime was limited to her post-shooting conduct of lying to police. Counsel specifically argued that Gibson was an accessory after the fact, emphasizing that she could not be guilty of aiding and abetting attempted murder if she did not intend to kill Terrell. Counsel's argument was sufficient to apprise the jury of Gibson's theory of the case.

Further, the jury was instructed with CALCRIM No. 401, which made clear that the prosecution, in order to establish Gibson's guilt as an aider and abettor, was required to prove both that she formed the requisite intent '[b]efore or during the commission of the crime,' and that her words or conduct aided and abetted the commission of the crime. CALCRIM No. 401 further informed the jury that 'the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.' We presume the jury followed these instructions, which clearly conveyed that Gibson could not be found guilty on an aiding and abetting theory based solely on her actions after the shooting. Under the circumstances, the trial court was not required to instruct the jury on the theory of accessory after the fact.

Gibson argues that her trial counsel rendered ineffective assistance by failing to request an instruction on accessory after the fact. However, a trial court may not instruct a jury on a lesser related offense unless the prosecutor agrees to the instruction. Gibson clearly believes an instruction on accessory after the fact would have

1
2
3
4

> benefited her, but she presents no evidence or argument showing that the prosecutor would have agreed to such an instruction. In the absence of any such evidence or argument, we conclude that Gibson fails to show that trial counsel's performance was objectively unreasonable, and fails to show prejudice. We therefore reject Gibson's claim of ineffective assistance as well.

5   (ECF No. 30-19 at 16) (internal citations omitted).

6          The Supreme Court has held that the failure to instruct on a lesser included offense in a

7   capital case is constitutional error if there was evidence to support the instruction.  Beck v.

8   Alabama, 447 U.S. 625, 638 (1980).  The Supreme Court, however, has not decided whether to

9   extend this rationale to non-capital cases.  The Ninth Circuit, like several other federal circuits,

10  has declined to extend Beck to find constitutional error arising from the failure to instruct on a

11  lesser included offense in a non-capital case.  See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir.

12  2000); Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial

13  court to instruct on lesser included offenses in a non-capital case does not present a federal

14  constitutional question."); James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state

15  court to instruct on a lesser offense fails to present a federal constitutional question and will not

16  be considered in a federal habeas corpus proceeding.").  The Ninth Circuit has "long rejected"

17  habeas claims based on failure to instruct on lesser included offenses in non-capital cases

18  "because the United States Supreme Court has expressly left this issue undecided."  Luis v.

19  Montgomery, 698 F. App'x 530, 530-31 (9th Cir. 2017) (citing Solis, 219 F.3d at 928).

20  Accordingly, the state court's decision on subclaims 1D and 1E was not an unreasonable

21  application of clearly established federal law, and habeas relief as to these claims should be

22  denied.

23                  3.  Failure to declare a mistrial due to juror misconduct

24          Petitioner's next ineffective assistance subclaim (1F) asserts that trial counsel was

25  ineffective for failing to promptly declare a mistrial based on juror misconduct.  On habeas

26  review, the Sacramento Superior Court denied this subclaim in the last reasoned decision:

27
28

> Petitioner asserts that sometime around June 20, 2018, she overheard Juror No. 2 state, 'Let's hurry up and vote them guilty,' because, Petitioner contends, Juror No. 2 said that he had a flight to catch on

19

1

2

3

4

5

6

> Monday, June 25, 2018. She alleges she informed counsel of the incident immediately after it occurred, but trial counsel waited until March of the next year to seek juror information to investigate the claim. The court denied the request for juror information because the alleged misconduct was known before deliberations commenced and therefore the claim was waived.
>
> When considering a claim of juror misconduct, a court 'looks to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant.' [Citation omitted.]

7

8

9

10

11

12

> The parties presented their closing arguments on June 25 and 26, 2018. The jury began deliberating at noon on June 26. They deliberated a full day on June 27. They indicated they had a verdict on June 28, at about 11:30 a.m. Per the court file all jurors were present for deliberations. Petitioner has not established prejudice. Assuming it true that Juror No. 2 said 'Let's hurry up and vote them guilty' because they had a flight scheduled for Monday, June 25, the juror did *not* have a flight scheduled or if they did, they cancelled it. All jurors were present through June 28. There is no indication the jurors 'hurried up' to vote guilty. Petitioner fails to establish that she suffered prejudice.

13 (ECF No. 30-24 at 6.)

14     As summarized above, on the last day of court testimony, petitioner allegedly overheard a

15 juror hoping to "hurry up" deliberations because he had a flight scheduled the following week.

16 However, there is no evidence that this juror's statement (or his implied intent to rush

17 deliberations) affected jury deliberations in any way.  On the date of the juror's alleged flight,

18 June 25, 2018, closing arguments were in progress.  The next day, the trial judge instructed the

19 jury, and two days later, they returned a verdict.  (See ECF No. 30-8 at 11.)

20     Months after the trial, on March 25, 2019, defense counsel filed a motion for access to

21 juror identifying information "for the purpose of determining facts in developing a motion for

22 new trial[.]"  (ECF No. 30-2 at 143.)  In the accompanying declaration, defense counsel stated

23 that petitioner "recalls" overhearing the juror's "hurry up" statement on June 20, 2018.  (ECF No.

24 30-2 at 145.)  On March 28, 2019, the Superior Court denied the motion, stating: "As the

25 misconduct alleged was known to the defendant before deliberations commenced, failure to raise

26 the issue in a timely manner is fatal to any new trial motion based on such misconduct."  (ECF

27 No. 30-2 at 147.)

28     Federal courts generally refuse to hear claims that were defaulted in state court "pursuant

1    to an independent and adequate state procedural rule." Coleman v. Thompson, 501 U.S. 722, 750

2    (1991); accord Shinn v. Ramirez, 596 U.S. 366, 371 (2022) ("A federal habeas court generally

3    may consider a state prisoner's federal claim only if he has first presented that claim to the state

4    court in accordance with state procedures."). Respondent argues that the trial court's ruling that

5    this issue was untimely raised makes it procedurally barred on federal habeas review. (ECF No.

6    31 at 13.)

7              The Court need not address that argument because, even on its merits, this subclaim fails.

8    The Ninth Circuit recently described the spectrum of juror misconduct on habeas review: "On one

9    end of the spectrum are prosaic errors which are 'so unimportant and insignificant' to be deemed

10   harmless." Brown v. Attorney General for State of Nevada, 140 F.4th 1069, 1075 (9th Cir. 2025)

11   (quoting Brecht v. Abrahamson, 507 U.S. 619, 330 (1993)). "On the other end of the spectrum

12   are egregious errors, which 'infect the entire trial process' and defy harmless-error review." Id.

13   (quoting Brecht, 507 U.S. at 629-30). "Somewhere in the middle are 'trial errors'" where the

14   reviewing court must assess whether the error had a "substantial and injurious effect or influence

15   on determining the jury's verdict.'" Id. (quoting Brecht, 507 U.S. at 629, 637). Here, the juror's

16   alleged remark was "insignificant"; it appears to have made no difference to juror deliberations.

17   Petitioner has not shown that defense counsel was ineffective for failing to seek a mistrial based

18   on this incident, nor has she shown prejudice as a result of counsel's failure to do so. Habeas

19   relief on this subclaim should be denied.

20                        4.  Failure to suppress evidence and information

21             Petitioner's final two ineffective assistance subclaims assert that trial counsel was

22   ineffective for failing to suppress prejudicial evidence (1H) and protected information (1I). On

23   habeas review, the Sacramento Superior Court addressed these subclaims as follows:

24                        a.  Failure to suppress February 6 argument

25            On habeas review, the Sacramento Superior Court addressed subclaim 1H as follows:

26                   In subclaim 1H, Petitioner asserts trial counsel erred when they failed
                     to suppress prejudicial evidence under Evidence Code section 352.
27                   The evidence in question involved an argument between Petitioner
                     and Terrell the night before the shooting. The appellate court
28

summarized the incident as follows:[4]

> 'Terrell was hoping to enjoy a romantic evening with Gibson on February 6, 2017. But Gibson came home later than expected and then announced that she was going out with a friend. Disappointed, Terrell went for a short walk. When he returned, Gibson's friend was there. An argument ensued. During the course of the argument, Terrell climbed into the passenger's seat of Gibson's parked car, as if to accompany her. Gibson tried to pull Terrell out of the car. Terrell resisted. Gibson scratched Terrell's face in the tussle.

> 'Gibson told Terrell he needed to leave the house. Terrell agreed and began collecting his belongings. As Terrell was packing to leave, Gibson asked that he return her car keys. Terrell responded that he did not have them. However, Terrell forgot that he had taken the keys and put them in the pocket of some work clothes. It was only later, after the events described below, that Terrell discovered the keys in his pocket.

> 'Terrell left Gibson's house and went to the home of a nearby relative. Over the course of the evening, Gibson called Terrell several times and sent several text messages, all demanding the return of her keys. Gibson also called 911 and reported that Terrell had taken her keys. Sacramento Police Officer Jeffrey Daigle called Terrell to ask about the keys. Terrell insisted, again, that he did not have them.'

> Although Petitioner cites section 352 of the Evidence Code, she argues the evidence was irrelevant. Per Petitioner, the argument was 'over and done with' and she had no communication with Terrell after February 6; therefore, the evidence of the argument had no 'connection' to what occurred on February 7. However, the argument on February 6 was the motive for the events that occurred the next day. There is no likelihood a trial court would have excluded the evidence of the argument, and trial counsel's failure to move to exclude it did not fall below an objective standard of reasonableness.

(ECF No. 30-24 at 6-7.)

At trial, Terrell testified that, on the evening of February 6, 2017, he and petitioner got into an argument at petitioner's house. As the argument escalated, petitioner tried to physically pull him out of her parked car and petitioner "hit my face and scratched me," after which Terrell decided to pack up his belongings and return to his aunt's house, where he was living. (ECF No. 30-8 at 193-195.) Terrell testified that petitioner demanded her car keys, and he told her repeatedly that he didn't have them, but later discovered they were in the pocket of his work clothes. (ECF No. 30-8 at 195-197.) Terrell testified that, when he was back at his aunt's house that night, the police came by to inquire about petitioner's keys; then petitioner's sister drove her

---

[4] See ECF No. 30-19 at 3.

1   there, and petitioner banged on the aunt's door asking for her car keys so she could get to school

2   the next morning.  (ECF No. 30-8 at 201-203.)  The next day, February 7, 2017, Terrell testified,

3   he and petitioner exchanged a series of texts.  He told her over the phone that the relationship was

4   over, and she continued to ask for her car keys.  (ECF No. 30-8 at 204-205.)  That evening,

5   Terrell testified, as he was walking down the street near petitioner's house, petitioner's car pulled

6   up and MacDonald shot him seven times with petitioner's gun.  (ECF No. 30-8 at 209-253.)

7          "The Supreme Court has explained that, when considering a Strickland claim based on

8   counsel's failure to bring a suppression motion, 'the relevant question' is whether 'no competent

9   attorney would think a motion to suppress would have failed.'"  Bowman v. Andrewjeski, 2024

10  WL 2103281, at *1 (9th Cir. May 10, 2024) (quoting Premo v. Moore, 562 U.S. 115, 124 (2011))

11  (unpublished).  "Moreover, 'in order to show prejudice when a suppression issue provides the

12  basis for an ineffectiveness claim, the petitioner must show that he would have prevailed on the

13  suppression motion, and that there is a reasonable probability that the successful motion would

14  have affected the outcome.'"  Id. (quoting Bailey v. Newland, 263 F.3d 1022, 1029 (9th Cir.

15  2001)).

16         Petitioner argues that defense counsel should have moved to have evidence of the

17  February 6, 2017 argument suppressed, as it was "over and done with" that evening and "more

18  prejudicial than probative[.]"  (ECF No. 25 at 11-12.)  On the contrary, according to Terrell, the

19  subject of the argument—the missing keys—carried over into the day of the shooting, when

20  Terrell told petitioner their relationship was over.  This testimony was highly probative of a

21  possible motive, and defense counsel had no reason to believe that a motion to suppress it would

22  be successful.  Trial and appellate counsel are not required to raise weak or frivolous arguments.

23  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Knowles v. Mirzayance, 556 U.S. 111, 125

24  (2009); see also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel did not render

25  ineffective assistance in failing to investigate or raise an argument on appeal where "neither

26  would have gone anywhere").  Petitioner has not shown deficient performance on this basis.

27  ///

28  ///

1                   b.  <u>Failure to suppress medical information</u>

2    On habeas review, the Superior Court addressed subclaim 1I as follows:

3            Lastly, in subclaim 1I, Petitioner contends trial counsel was
ineffective for failing to suppress protected information. Petitioner

4    asserts that a pregnancy test was discussed in open court which
violated her right to privacy under HIPAA (Health Insurance

5    Portability and Accountability Act). Frankly, the allegation is
unclear. Petitioner states that 'the prosecution wanted to show if a

6    pregnancy existed or not, in other words, if a lie was told or not.' It
is presumed Petitioner made a statement at some point regarding the

7    test such that the test results would establish whether Petitioner lied.

8    . . .

9            Moreover, assuming a HIPAA violation occurred, it is unclear how
this impacted the conviction and/or the sentence. Petitioner fails to

10   develop the claim and therefore fails to make a prima facie case for
relief.

11

12           For the reasons discussed in each subclaim above, Petitioner's claims
that trial counsel was ineffective are denied.

13   (ECF No. 30-24 at 7-8.)

14         Petitioner argues that defense counsel was ineffective for failing to suppress "protected

15   information" about a pregnancy test, which "should not have been seen by a jury[.]"  (ECF No.

16   25 at 13.)  It is not clear what specific evidence is at issue, though there was some testimony

17   related to pregnancy.  (See, e.g., ECF No. 30-8 at 175-176.) At any rate, petitioner has not shown

18   deficient performance for failing to seek suppression of the pregnancy evidence as private health

19   information.  See U.S. v. Streitch, 560 F.3d 926, 935 (9th Cir. 2009) ("HIPPA does not provide

20   any private right of action, much less a suppression remedy."); Y.C. v. Superior Court, 72 Cal.

21   App. 5th 241, 257 (2021) (HIPAA "does not include a suppression remedy") (collecting cases).

22   Nor has petitioner shown that suppression of this incidental information would have affected the

23   outcome of trial.  Habeas relief is unwarranted on subclaims 1H and 1I.

24         B.  <u>Claims Two and Three: Failure to Instruct on Lesser Included Offenses</u>

25         In Claims 2 and 3, petitioner argues that the trial court erred by failing to instruct the jury

26   on the lesser offenses of conspiracy to commit assault with a deadly weapon and accessory after

27   the fact.  On direct review, the Court of Appeal addressed these claims as set forth above with

28   respect to the related ineffective assistance subclaims 1D and 1E.

1    As with her related ineffective assistance claims, it is not "clearly established" Supreme

2  Court law that due process requires giving a lesser included instruction in non-capital cases.

3  Solis, 219 F.3d at 929.  As the last reasoned state court decision on Claims Two and Three was

4  not "contrary to, or involved an unreasonable application of, clearly established Federal law, as

5  determined by the Supreme Court," petitioner does not state a cognizable federal habeas claim for

6  failure to instruct on lesser offenses.

7    C.  Claim Four: New Trial due to Inadmissible Evidence

8    In Claim 4, petitioner argues that cell phone data was obtained in violation of her Fourth

9  Amendment rights, necessitating a new trial.  On habeas review, the Sacramento Superior Court

10  addressed this claim as follows:

11    In Claim 4, Petitioner argues that the trial court erred when it denied
    her motion for new trial based on the then-recent U.S. Supreme Court
12    case of Carpenter v. United States (2018) __ U.S. __, 138 S.Ct. 2206.
    There, the Court held that a warrant is required for police to access
13    cell site location information from a cell phone service provider. The
    decision was issued on June 22, 2018, which was during the trial in
14    the present case.

15    First, the claim could have been raised on appeal, but was not.
    Therefore, it is barred in habeas. [Citation omitted.]
16
    However, if the claim were not barred, it would be denied on the
17    merits. At the time officers obtained cell phone data in this case,
    February 7, 2017, the Supreme Court had not yet issued its decision
18    holding that a warrant is required for police to access cell site location
    information from a cell phone service provider. Thus, in 2017, the
19    police were unaware they were required to obtain a warrant.

20    Assuming the holding in Carpenter is retroactive to cases not yet
    final, the question is what remedy would have been available. To
21    supplement the Fourth Amendment the Supreme Court created the
    'exclusionary rule.' The purpose of the rule is to deter law
22    enforcement officers from conducting searches or seizures in
    violation of the Fourth Amendment and to provide remedies to
23    defendants whose rights have been infringed.

24    Though not binding, this Court finds the rationale from the United
    States Fourth Circuit of Appeals persuasive:
25
    'While Carpenter is obviously controlling going forward, it can have
26    no effect on Chavez's case. The exclusionary rule's 'sole purpose . .
    . is to deter future Fourth Amendment violations. Davis v. United
27    States, 564 U.S. 229, 236-37 (2011). Thus, when investigators 'act
    with an objectively reasonable good faith belief that their conduct is
28    lawful, the exclusionary rule will not apply. Id. (internal citation

25

1    omitted).

2    Thus, if Petitioner suffered a Fourth Amendment violation, nothing
     required the court to exclude evidence obtained *prior* to the Supreme
3    Court's holding in <u>Carpenter</u>. At the time the officers obtained the
     cell phone location information from the cell phone service provider
4    they acted with an objectively reasonable good faith belief that no
     warrant was required.

5

6    (ECF No. 30-24 at 8-9.)

7          On April 15, 2019, petitioner's counsel filed a motion for new trial, arguing in part that

8    petitioner was denied a fair trial due to the admission of cell phone evidence obtained in violation

9    of her Fourth Amendment rights.  (ECF No. 30-2 at 148-155.)  The State filed an opposition (<u>id.</u>

10   at 165-175), and on April 26, 2019, the trial court heard and rejected the new trial motion as to

11   the cell phone evidence, among other grounds.  (ECF No. 30-13 at 258-259.)  Petitioner did not

12   raise the Fourth Amendment issue on appeal but raised it on state habeas review and received a

13   decision, as set forth above.

14         "[W]here the State has provided an opportunity for full and fair litigation of a Fourth

15   Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground

16   that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  <u>Stone</u>

17   <u>v. Powell</u>, 428 U.S. 465, 494 (1976); <u>see</u> <u>Newman v. Wengler</u>, 790 F.3d 876, 880–81 (9th Cir.

18   2015) (holding <u>Stone</u> survived enactment of AEDPA).  "The relevant inquiry is whether

19   petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even

20   whether the claim was correctly decided."  <u>Ortiz–Sandoval v. Gomez</u>, 81 F.3d 891, 899 (9th Cir.

21   1996) (citations omitted); <u>see also</u> <u>Newman</u>, 790 F.3d at 878 (explaining that, "[u]nder <u>Stone</u>,

22   exclusionary rule claims were barred if the petitioner had a full and fair opportunity to litigate

23   them below whether or not they were actually adjudicated on the merits").  Here, the record

24   shows the state court provided petitioner with a "full and fair opportunity to litigate" her Fourth

25   Amendment claim.  <u>See</u> <u>Stone</u>, 428 U.S. at 494; <u>Moormann v. Schriro</u>, 426 F.3d 1044, 1053 (9th

26   Cir. 2005) (explaining that "[i]f the state has provided a state prisoner an opportunity for full and

27   fair litigation of his Fourth Amendment claim, we cannot grant federal habeas relief on the Fourth

28   Amendment issue").  Habeas relief on this claim should be denied.

                                                26

D. Claim Five: Prosecutorial Misconduct

In Claim 5, petitioner asserts that the prosecutor committed misconduct when questioning Terrell on the witness stand. Petitioner argues that several questions were unrelated to past events in the case and were intended to elicit sympathy for Terrell with the jury. On habeas review, the Sacramento Superior Court addressed this claim as follows:

> In Claim 5, Petitioner contends the prosecutor committed misconduct during the questioning of victim Terrell. She contends it was misconduct for the prosecutor to ask the victim, 'Do you need some water?' And, 'If you need a break at any time, let us know,' among other innocuous queries. To support her claim Petitioner cites Bell v. Miller (2007) 500 F.3d 149, but it is not applicable. The sole question in that case was whether trial counsel's failure to consult a medical expert constituted ineffective assistance of counsel. It is unclear how that case is relevant to the issue of prosecutorial misconduct in the present case.
>
> 'To constitute a violation of the federal Constitution, prosecutorial misconduct must so infect the trial with unfairness as to make the resulting conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citation omitted.]
>
> Asking the witness if they needed a break or would like some water did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. Nor were the questions a deceptive or reprehensible method to persuade the court or jury. Petitioner fails to state a prima facie claim for relief.

(ECF No. 30-24 at 9-10.)

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (explaining that prosecutorial misconduct rises to the level of a constitutional violation only where it "so infected the trial with unfairness as to make the resulting conviction a denial of due process"). But even if prosecutorial misconduct rises to the level of a due process violation, such "violation may provide the grounds for granting a habeas petition only if that misconduct . . . 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004) (quoting

1    Brecht, 507 U.S. at 637).

2          The Court has reviewed the challenged statements.  The prosecutor asked Terrell on the

3    stand if he needed water or a restroom break and, later, suggested a break when he said he felt he

4    was going to throw up.  His testimony resumed after a short recess. (ECF No. 30-8 at 184, 221,

5    229.)  These innocuous statements do not rise to level of misconduct and certainly did not render

6    petitioner's trial "fundamentally unfair."  Habeas relief on this claim should be denied.

7          E.  Claim Six: Court of Appeal Error

8          In her final claim, Petitioner asserts that the Court of Appeal erred under "§ 2254 D in

9    Argument V and VI." (ECF No. 25 at 19.)  It is not clear what petitioner means by this claim,

10   except to disagree with the Court of Appeal's decision on direct appeal.  On habeas review, the

11   Sacramento Superior Court addressed this claim as follows:

12          Lastly, in Claim 6, Petitioner contends 'Appeal unreasonable and
            beyond any fair minded disagreement per § 2254 D in Argument V
13          and VI."  It presumed Petitioner is referring to section 2254 of title
            28 of the United States Code which addresses the standard federal
14          courts must apply when considering a petition for writ of habeas
            corpus filed in federal court by a state inmate. This is a state court
15          proceeding. The federal statutes are inapplicable.

16   (ECF No. 30-25 at 10.)

17         Petitioner challenges the Court of Appeal's denial of her ineffective assistance claims.

18   The state Supreme Court affirmed the Court of Appeal's decision, and the Court has considered

19   petitioner's ineffective assistance claims on federal habeas review.  This claim should also be

20   denied.

21   V.  CONCLUSION

22         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's amended petition for a

23   writ of habeas corpus (ECF No. 25) be denied.

24         These findings and recommendations are submitted to the United States District Judge

25   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

26   after being served with these findings and recommendations, any party may file written

27   objections with the court and serve a copy on all parties.  Such a document should be captioned

28   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

28

1   he shall also address whether a certificate of appealability should issue and, if so, why, and as to

2   which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

3   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

4   § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

5   service of the objections.  The parties are advised that failure to file objections within the

6   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

7   F.2d 1153 (9th Cir. 1991).

8

9   Dated:  October 30, 2025

10                                                              _____

11                                                              CHI SOO KIM
                                                                UNITED STATES MAGISTRATE JUDGE

12

13

14

15   6/gibs0844.157.csk

16

17

18

19

20

21

22

23

24

25

26

27

28

29